We're happy to hear argument in our next case, number 134711, etc. United States v. Fields. As soon as the lawyers get themselves organized at the council table, we're happy to begin argument. Good morning, your honors, and may it please the court. This case is about a criminal defendant who was not allowed at trial to put on evidence that was admissible, relevant, and indeed critical to his defense. Stephen Fields was a loan officer at the Bank of the Commonwealth starting in 2003, and the government alleged that beginning in 2008, Mr. Fields entered into a criminal conspiracy with other officers at the bank and with certain borrowers to defraud the Bank of the Commonwealth. Through a series of erroneous rulings, the district court prevented Mr. Fields from putting on the defense that the actions he took were in good faith and were intended to help his borrowers and protect the bank from taking massive losses during the 2008 financial crisis. The district court's rulings on hearsay held that any out-of-court statement offered to support the defense, regardless of the purpose for which it was offered, constituted hearsay. And on this ground, Mr. Fields was prevented from putting on very important evidence regarding specific statements and acts that were wholly inconsistent with the government's theory of fraud. The district court also held that, under its view of cross-examination, that the defense was not allowed to cross-examine witnesses based on prior acts of dishonesty if those acts were uncharged. During the course of any trial, particularly a trial of this length, there are going to be a series of evidentiary rulings that invariably are going to go for and it can't possibly be the case that the trial judge is going to be correct on each and every evidentiary ruling. In fact, that's why we have a fairly deferential standard of review with respect to those kinds of rulings. I had a difficult time trying to figure out exactly, and it may be a function of the fact that there are so many defendants and so many issues in this case, trying to figure out what the best argument you had with respect to these evidentiary rulings because it can't possibly be the case that each and every ruling was a make-or-break decision for your client. Can you help me with that? Yes, Judge Diaz. We are not submitting that every single ruling was a make-or-break. But the two tests that are relevant in this case is, number one, abusive discretion. Which is a very deferential standard. I agree, Your Honor. But this court has held that when the judge doesn't apply the correct rule, doesn't know how the rule of evidence fundamentally works. We also have harmless error. That's correct, Your Honor. And in this case, we submit there's not just one, but multiple. But I think you've been asked, what's the strongest argument about a mistake that was critical to you? I think that's what Judge Diaz asked you. You sort of say every ruling was wrong, but... We know the law. Yeah. I understand, Your Honor. We know the standard. But if you tell us, you can point to the one thing, the one evidentiary ruler that you think was the most wrong and the most damaging for your case. What would that be? I would focus, Your Honor, on rulings pertaining to the allegation that Mr. Fields engaged in a conspiracy with two individuals named Menden and Hrnowski. And along those lines, I'll give the court several critical rulings. One is that Mr. Fields sought to show that these individuals were skilled liars and fraudsters who, in fact, took Mr. Fields for a ride, that they took advantage of him. And what he was not... They were co-defendants, weren't they? They were not co-defendants. They were alleged co-conspirators. Co-conspirators. So he was not allowed to cross-examine them on, and I would submit, an astounding record of dishonesty that... Well, they were impeached. I guess they weren't impeached as forcefully as you would have liked. They were not... I would say, Your Honor, that they were not impeached meaningfully by the restrictions set by the court. Now, who are these? These were two... What were their names again? Menden... Yes, Judge Shedd. Menden and Hrnowski. Were these the ones who admitted they were liars and perjurers?  Do I have the right ones? You do, Your Honor. And I don't have exactly which one. I think it was Menden, because I read the record as best I could and as I thought was necessary. But he said, yes, I'm a perjurer. Yes, I've lied. Yes, I've lied in a court proceeding. That's the one? Yes, Your Honor. Is that one of them? Yes, Your Honor. And you don't think that's meaningful impeachment? I do not, Your Honor, because it's important... I tried district... I was a district court judge for 12 years, and I tried cases. Any lawyer that I knew would have jumped for joy to get that kind of impeachment. Do you want them to admit it three times over? No, Your Honor. The trial judge did not allow counsel to make a proffer on this point. No, but he allowed you to get that in the record. He did. But what he did not allow, Your Honor, were something very, very important to Mr. Fields' theory, which is that Mr. Fields himself, that these individuals took actions, including forgery and fraud, towards Mr. Fields himself. They did not get to present evidence that these individuals duped Mr. Fields himself by using things such as forgery and submitting false documents to him. And that, I would say, Your Honor, demolishes the government's idea that he was somehow in bed with these individuals. So why didn't you get to that in the time period you had? Why didn't you ask about that? Because the trial counsel was abruptly cut off. He tried to make a proffer. Let's talk about the abrupt cutoff. You were given how long for direct examination? Approximately seven and a half hours, Your Honor. So in that spread over four days? Not correct, Your Honor. I believe that was a day and a half. A day and a half? Yes, ma'am. Okay. And what time, how long had you told the district court that you were going to take? The trial counsel initially estimated two to three days on the express representation by the court that they would not be held to time limits. Oh, give me a break. The court doesn't give you a representation that you rely on in estimating your time. You estimate your time, and the court says, fine, that's flexible. And as I read the record the court gave you, and I will go check it again, but I'm holding you now to one and a half days. You asked for two and a half. Is that right? And the court only gave you one and a half after saying it would give you two and a half. Is that your representation to the court? No, that's not. Okay, what is your representation? Our representation is that when counsel was asked at the outset of trial how long they would take, the judge specifically said, and I'm not going to hold you to this. You know why the judge says that? Because if he doesn't, no lawyer would ever give an answer. He would go, how long is it going to take, Your Honor? We can't say at this point. Well, just give me a rough estimate. I'm not holding you to it. Two or three days, that's how it's done. Because if you ask a lawyer, tell me, and I'm holding you to it to the exact second, there's not a lawyer in the country that would give an answer. There's not a judge that would do that either. That's what I mean, but that's why it's not done that way. I want to hear your representation. I want to then go check the record. So tell me what you were told, how many hours you were told you would have, and how many you were given. Well, Your Honor, the estimate was two to three days, and trial counsel, I believe, received three days for the whole defense case. And Mr. Fields, of that time, Mr. Fields testified for seven and a half hours. And, Your Honor, I see my time is up. It is up, you're right. Thank you, Your Honor. I'll sit down. If we let you go, how many minutes would you need? No, no, no. I wouldn't. May it please the Court, Andrew Sachs here for Appellant Edward Woodard. I'm from NAWFA. Good to see you, Your Honors. I have four minutes, and it's ticking quickly, so I'll get right to the point. Appellant was convicted of a dozen counts, and our primary issues are the sufficiency of the evidence on each of those counts. We have also raised some issues regarding issues for new trial. I'm not abandoning those, but I will confine my remarks to the sufficiency. With respect to Count 1, the conspiracy to commit bank fraud, Your Honors, the allegations were that Mr. Woodard fraudulently, the conspiracy was to fraudulently conceal the bank's true financial conditions. Who do you represent, would you tell me again? I'm sorry, Edward Woodard. Okay. Edward Woodard. Thank you. Who is the father, Your Honor. Thank you. He was the president. No, I know who that is. Yes, sir. Thank you very much, Your Honor. With respect to the conspiracy, the evidence is circumstantial at best, and our position is that it is insufficient as a matter of law to sustain the conviction. Because it's circumstantial or just because it doesn't, it's not enough? It's not enough. I point out it's circumstantial because I think that's the starting point. But circumstantial evidence is almost always the evidence of conspiracy. Well, it's often the case. We often don't have written agreements. That is true. But in this case, there were 45 hours of taped undercover, if you will, or informant type surveillance that yielded no statements, no admissions by Mr. Woodard, no document that we would submit that indicates a conspiracy, no admission of a conspiracy by any other defendant or co-conspirator. Was there any evidence of a conspiracy? We urge no, Your Honor. We urge no. We do not believe there was. There was no, of course, as the Court has pointed out, it's often difficult to find an agreement, but we submit there was no evidence of agreement in this case. And the government's, the thrust of their case on the conspiracy really was that there were unsafe and unsound practices that were engaged in by the bank. But those are not illegal acts. Those are, they may be imprudent, it may be negligence, it may even be reckless, but it doesn't constitute a conspiracy. In addition, one of the alleged co-conspirators, Mr. Hounslow, who was acquitted, testified that not only was there not agreement amongst these individuals, there was frequently disagreement as to how these loans should be handled. And in the presence of evidence of disagreement, we would urge that that evidence in and of itself vitiates the idea that there was some agreement or some parallel. Is the fact that one of these defendants was acquitted on all of the offenses something that we should consider in deciding whether or not this evidence is troubling, if not insufficient? Well, I think that it's something that the court should give some consideration to, yes. I do. I think that because they alleged a conspiracy amongst all of them, and the jury found that that defendant was not a part of any conspiracy, and in fact that defendant, as I indicated, testified that there was disagreement amongst the parties. I would also like to point out there's a common thread throughout these counts that there has to be an intent to defraud or an intent to injure the bank. Was there testimony that Menden said that your client told him that the son needed some money and he agreed to loan him money but got money from the bank, which he then delivered in a brown paper bag? I don't think that our client was aware of the actual delivery of money in a brown paper bag. But that happened. When Menden made the loan to the son at the urging of your client, where did Menden then get the money from? Where did that money come from? It is my recollection that there was no evidence of the source of the money. It was not testified to affirmatively, in my recollection, that it came from a loan from the bank. Well, the bank had loaned Menden lots and lots and lots of money, and then he would go to other banks and get it. That is true. But with respect to Judge Shedd's specific question, I don't think there's evidence that that money was essentially laundered back, if you will, to the son. Okay. Four minutes goes quickly. It does, Mr. Shedd. All right, now it's going the other direction. Thank you very much, Your Honor. I'll reserve a minute for rebuttal. Good morning. I'm Brian Donnelly. I represent Brandon Woodard. I was not involved in the trial, which was rather lengthy, and I think that's why I did make a mistake in my brief, which I think is on page 92. I made a reference to the fact that the Suffolk Bank property that Brandon Woodard acquired, he purchased it. It was then improved by the bank, and then after that, he borrowed money against that property as improved. That's a misstatement on my fault. I've conferred with the government. What happened is the original lender, Farmers Bank, demanded a cross-collateralization of that loan for other properties, and that's how it got tied up. But there was no fresh money that was presented to Brandon. I won't address any of the sentencing issues. I'm mostly concerned with starting with Counts 16, 17, and 18, the loans that were made, essentially three pieces of property that Menden and— You don't abandon the sentencing issues? No, no, I'm just— Okay, thank you. —with time limitations. Thank you. Those loans essentially were made—Brandon had started developing long before. These were some properties he had. He wanted to get out from under them. It was to his advantage. I don't deny that. But when he conveyed the property to these two other individuals, at that time, as far as he knew, they were financially strong. There were appraisals done on the property. Essentially, all the bank did was substitute one borrower for another, and the new borrowers were financially able to carry the loan. It definitely benefited Brandon, but it had nothing to do with damaging the bank in any way. I think the judge, Jackson, went through a long dissertation during the motion for— the Rule 29 motion, the conclusion of the government's evidence, and he pointed out quite clearly all of the problems that the government had with its case, showing intent to defraud a bank relating to these transactions. And I had an argument that when he did eventually rule on it at the conclusion of the trial, he made reference to the fact that there was conflicting evidence, and that could only come about through defense testimony. So the judge was relying, I think, on evidence after the fact. Or cross-examination during the government's case. I don't think he was—I think he was referring to what came in after. I know what you think, but— If there was something that happened in the government's case in chief, then there should—if there was a conflict there, then there should have— then that's another reason to throw the case out at that point if you don't have— There can be a conflict, but still you wouldn't be entitled to judgment as a matter of law. In other words, the jury could buy one version or buy another. Well, this is—I think we're going back in time to the conclusion of the government's evidence. No, I just— The government— I thought your principal argument with respect to these counts that you were talking about was the lack of fraudulent intent. You seem to be making an argument that the bank wasn't damaged, and therefore there was no— I don't know that you have to have damage. I think it's intent. But I don't—it clearly was to his benefit to basically unload these properties, but I don't think that has—that shows that the motivation was to damage a bank. You just substitute one borrower for another one. And sure, it helped Brandon Woodard, but that transaction did not put the bank in jeopardy in any manner. What about the commissions that he got that no other person in his shoes got? I think two things. One is the bank—if I'm not mistaken, the bank upped the rate for commissions on those transactions so that it actually received more money than it would have in general. The bank also passed a policy for everyone to participate in that. Nobody else joined in. But Brandon just simply made a referral of a commercial loan to the bank and received the benefit. But there was evidence in this record that no other person that was working where he was and made referrals to the bank for commercial loans got this commission. He perhaps was an aggressive lender and had contacts, and they didn't use what was made available to them. It was clearly the board put that in front of the other bank people, the lenders, that they could do it if they wanted to. Nobody stepped forward. Was that board policy—the board approved that policy after he'd already received commissions? Sort of contemporaneously, as I understand it. It was contemporaneously? I thought it was. Which went first? I'm just asking. The commission payment, the first commission payment to him, or the board approving the policy? I think it was the way you've described it. I think once it was seen, somebody says, well, I think everybody ought to join in on this. So I'm just asking. So from the record, it seems he got a commission and then the policy was approved. You think that's the case? I think that's the case. Thank you. Thank you very much. Do I have a little time for rebuttal? Ms. Martin? Is there something to tell us? May it please the court. This trial was fundamentally fair. Over the course of 10 weeks, the district court effectively managed the introduction of over 600 exhibits— I'm sorry, nearly 1,000 exhibits and the testimony of over 100 witnesses. Now, in doing so, the court was careful to ensure that all parties were able to present their case and challenge the opposing party's case. Ultimately, the jury heard both sides of the story and convicted all three of these appellants of a broad conspiracy to commit bank fraud. What if the commission's—the last question we just ended on, of the counsel, what if they hit commission payments? What's wrong with that? And how is that evidence of any violation of the law? Well, I think what's wrong with those commission payments is that they were concealed. They weren't available. I know, but I've read your argument about how they were concealed. What does that have to do with anything? Have you done very many loan closings? I have not, Your Honor, but— You pay fees, trust me. Everything you pay, when you borrow money, you don't know about it. And by the way, sometimes when you pay, like it says, real estate agent gets 7 percent, trust me, the agent that dealt with you doesn't get 7 percent. The broker in charge gets a chunk of that. There's nothing illegal about that, untoward about that. I don't even understand why that is evidence of any wrongdoing. I'd like for you to tell me why that is. Well, Mr. Brandon Woodard raises the issue of commissions as it relates to the calculation of his loss amount. I know that, too. We'll talk about that in a minute. Do you see— Let me ask this question, then maybe we can move on. Is it your position that the fact he received commissions is not evidence of any substantive law violation? No, it is part of the evidence the government presented in furtherance of the conspiracy. No, no, no. I know you said it's evidence you presented. I ask, how is that evidence? It's evidence that this defendant was defrauding the bank. That is, he was— Wait, stop. How is he defrauding?  Is it illegal to get a commission? It's not illegal to get a commission. So why is it evidence of wrongdoing? Somebody gets paid by commission. It's evidence of wrongdoing when you're actually—that commission is coming from what was the bank's origination fee. Can I tell you this much? I'm going to tell you this. Whatever the bank pays to any employees, that comes from the bank. Right, but the bank knows that, right, Judge? Well, that's a different question. Okay. And he wasn't an employee of the—he keeps telling us, not an employee of the bank, of the subsidiary. He was a vice president of the bank's mortgage loan subsidiary, but I would submit as— And the people from the mortgage loan subsidiary that sent loans to the bank, nobody else got the commission but Brandon, right? Exactly, Your Honor. We got a sweetheart deal, but I still ask, how is that evidence of a substantive violation of the law? I mean, maybe it could be, but I couldn't find it in the record. I'm waiting for you to tell me. You may not like it, but what's wrong? The bank may decide—the bank pays employees, but they also pay everybody else. They pay the janitors. They pay delivery service. They pay a lot of people. Well, the difference— And that money is the bank's before they pay it, but if somebody has a right to be on a commission basis, the government's theory is that's a violation and that's supposed to be a conspiracy because he walked away with the bank's money. But I think it's just a complete—I think a misunderstanding of how the world works. If it's not illegal to have a commission and somebody agrees to pay a commission, there's no theory that it's illegal because the commission you're paying belongs to the bank until they pay the commission. I don't even understand that theory. Well, I think the difference here is what you just said, Judge, if you agree to pay the commission. Right. And here the government introduced evidence that the commercial credit reviews for these loans that Brandon received commissions on, they were presented to the bank's board, but there was no indication in those reviews that the board was approving that the origination fee was going to Brandon in the form of a commission. Part of it was, I think. All of it or part of it? None of it was. No, no, I'm saying what part of it was actually going by way of commission. Is that right? Right, exactly. Did the bank approve that policy? The bank approved the policy after the fact, after he had already received the commissions. So you think it's proof of what substantive offense that he was being paid commission, which is legal, although he's by himself in getting it, and that the proof of the crime is the failure to disclose it to the board? I think it's proof of a fraudulent intent. That is, that you are concealing that what is owed to the bank is actually being paid to this employee in the form of a commission. But we know after the fact, when the bank was asked the question, the board approved it. Ultimately, after the fact, the board did approve, but. Did you have other evidence of his involvement in the conspiracy other than the commission? There was certainly a significant amount of evidence of Mr. Give me the next best evidence you have. Mr. Woodard was engaged in an illicit relationship with Eric Mendon and George Harnowski, whereby these partners purchased two of his failed investment properties and his personal condominium with full financing from the bank in exchange for preferential lending treatment for the bank. We submitted evidence that Brandon Woodard attempted to sell six more of his failed investment properties to these same partners using a nominee borrower. Where's the evidence? And I'm just going to stay on this side of the question. I'm sure my colleagues have others. Well, we're talking about commission. Where's the evidence of the use of the of the son's use of a position of trust in the violation? I could not figure that out from the sentencing transcript. I think I think the argument for the government is that he used his discretion to obtain these commissions to which he was not entitled. No other. Why is he? Let me stop you right there. Why is he not entitled to? He's not entitled to them. No other employee at the bank received them. What does that matter? It doesn't matter. I suspect you get paid differently than some of your colleagues. I mean, I don't understand the government's theory that you can't get paid by commission. Our theory is not that you can't get paid by a commission. Our theory is that. My point is, let me get right to it. I don't see that getting paid by commission is a violation or use of his position of trust in the conspiracy. Do you have? I couldn't find any other evidence, certainly not at sentencing. Do you have some evidence that his position of trust aided him in the commission of the conspiracy? It did aid him in his in his commission of the conspiracy. He was, along with his father, involved in backdating and falsifying bank records to conceal his inside ownership of bank branches. And that was because he had the position of trust that he could do that. It certainly facilitated his defense that he and his father both worked at this bank and were aware of, for example, where the bank was going to build its next brand. Yes. Was that he did he work at the bank or not? He was a vice president of the bank's mortgage loan subsidiary. But the government certainly approved of the trial that he was an agent of this bank. He was paid by we introduced his W2. He's paid by the bank. He had an expense account with the bank. He was regularly involved in bank decisions. He was, in fact, awarded part of he was awarded a loan officer code, which allowed him to take credit for loans that loan officers were doing. So he operated, as the government's argument was, as a quasi loan officer. Did the court rely on any of anything you're saying other than the commissions to apply the enhancement for a position of trust to you? I couldn't find it. I think the court primarily. I admit this is absolutely the tip of the tail wagging the dog. But I just asked you these questions because I couldn't figure it out. I think the court's primary base, the court's primary basis for the abuse of trust enhancement was the awarding of commissions and Mr. Woodard's use of his position in order to obtain those commissions. There were certainly a number of other. In fact, thank you. Thank you very much. Thank you. I don't take all your time. I would ask you about this issue with respect to the limitation of time for Mr. Fields. I think you heard the questioning, and certainly I don't think it's reasonable to that the attorney for fields would have thought that the judge was necessarily holding him to an amount of time. But on the other hand, he was asking for an estimate of time, and he gave that estimate. And at that time, Judge Jackson didn't say one way or the other whether or not he was going to hold the lawyer to that time. It was only after the first, I guess, four hours that it became an issue. Is it fair to say that, I mean, the defendant's lawyer might have been surprised by the fact that instead of having the two and a half days that he suggested he might have, he only had a day and a half? Well, Your Honor, I think the best answer to that is a real look at the sequence of events here, because I think when you look clearly at the sequence of events as it relates to Mr. Fields' direct testimony, it's clear that the court wasn't arbitrary in its time limit and the defendant was not surprised by it. As you noted, at the outset of his case, he was asked how long he estimated it to last. He estimated two to three days. Ultimately, the court gave Mr. Fields four days to present his case. Now, Mr. Fields actually testified for two and a half days. He spent one and a half days on direct examination, nine hours. Now, I know in the record, the court talks about seven and a half hours. That's seven and a half hours on the second day. He started testifying on day 34. He then had another whole day for cross-examination and redirect, and that cross-examination included not just cross-examination by the government, but cross-examination by his four co-defendants who were presenting with him a joint defense. On day 34, Mr. Fields' first day on the witness stand, the court warned counsel that he would need to wind up his testimony the next day. By midday the next day, the court informed counsel again that he would need to wind up his testimony that afternoon. By that time, had Fields presented the rest of his evidence, or was he then presenting additional evidence beyond his testimony? He was the last witness in his case, yes. Now, at the time the court warned him the second time he would have to wrap up that day, he noted that Mr. Fields had testified for four hours before even reaching the substantive counts of the indictment. The court then warned Mr. Fields two more times to quicken and focus the pace of his examination before it actually imposed a hard stopping point of 630. And when the court imposed that time limit, it again noted that despite its repeat warnings, counsel had not adjusted the pace of his examination. The court gave at least two more warnings to Mr. Fields before adjourning for the day at 645. Now that was ten minutes beyond at least what the hard limit the court had given of 630, and over an hour beyond the court's normal practice of adjourning at 5 or 530. So certainly counsel was not surprised over the course of his direct testimony, Mr. Fields received seven at least admonishments from the court related to the duration of his examination. How long were the other witnesses, the other defendants, the other defendants that are in front of us now on the stand? And I think, Judge, that's evidence that Mr. Fields had a full and fair opportunity to present his case. The five other defendants, I'm sorry, the four other co-defendants in the case were all able to present their testimony in less time than that. Mr. Fields was the defendant with the longest testimony. Do you know how long Edward Woodward, all three of these, all three of the people that are now in front of us testified on their own behalf? Yes, Your Honor. Do you know how long Edward Woodward was on the stand? I believe Mr. Woodard was on the stand for a day and a half. Mr. Woodard, of course, was the lead defendant in the case and charged with the most counts and transactions. He was charged with 12 counts, and Mr. Fields, in comparison, was charged with seven individual counts. Ms. Martin, is it your position that the defendant, Mr. Fields, forfeited his right to talk about these remaining counts by virtue of not adhering to the court's time limits, or that despite the time limit that he had a full and fair opportunity to present his defense as to all the offenses? It's the government's position that despite the durational time limit set by the court, Mr. Fields was able to present his central defense during his direct testimony. But he didn't get to speak about each and every count, and I guess your position is he didn't have to? Well, certainly, I think this court has found that a defendant isn't entitled to testify about every single transaction that he's involved in, and that would be impracticable in any large fraud case where defendants are often charged with hundreds of iterations of a scheme. It would be impractical for a defendant to be able to testify about each and every one of those. Well, but Mr. Fields here says that there weren't hundreds. There were about 20-some-odd, maybe 25, 26 transactions that he wanted to tell his story about. Why is that unreasonable? I think it's not unreasonable. He had an opportunity to address his relationship, his lending relationship, with borrowers Menden and Harnowski, his lending relationship with Thomas Arney. He talked about how he believed that… It's part of it that he was given a lot of time, and he could figure out how to use the time the way he wanted to. Exactly, and frankly, Judge, if he had so many material points and so many transactions that he was unable to address, he surely would have used every second that the court had allotted him. But in fact, the court gave him an additional hour and a half on redirect. The government's cross-examination… Didn't the district judge open the scope of redirect? Absolutely, Your Honor. Which is, quite frankly, it's not what the rules say, but the court has discretion, and didn't the court in this case just say, ask what you want to ask, basically? Well, exactly. The government crossed Mr. Fields on the entire conspiracy, and so therefore the scope of redirect was expansive. Mr. Fields was able to redirect on any topic. That doesn't answer my question. I thought the court indicated you could redirect on anything, not just what you would ask about. What's your recollection? I don't think that that's exactly how the court put it, Judge. Do you think the court limited on redirect to what was asked in cross-examination? Are you sure about that? I think so, Judge, but what I would say is that cross-examination was everything, so therefore redirect was also expansive. Mr. Fields had the opportunity to elicit a number of points on redirect that he did not get. Was there a clock on the redirect? There was. The court gave Mr. Fields an hour and a half on redirect, and he ended up finishing up his redirect with 15. . . He didn't use the all the time. No, he didn't, and the court noted that in the record. I don't want to look for it right now. I thought you argued in your brief the point that the court allowed on redirect to go into things that he hadn't gone into before. Did you make that point in your brief? He did. Let me ask this. Why would you make that point if your argument is the court just allowed Mr. Fields to do what the rules allow? Why is that any point worth making in your brief? I think your point is that the government cross-examined him on things that he had not testified to on these other counts that he hadn't gotten to, and then the district judge allowed him to, as was appropriate, to do a cross-examination on those things that he hadn't testified to on direct, but that you had brought up. And you get to the same place that Judge Shedd was, because you brought up everything. You brought up all the counts. But my point is, I thought you were making the point that he gave greater latitude on redirect than you normally would. That's not your point. That's not my point. Okay. That's not my point. I thought that was your point. But you do still have the point that he didn't use El Pollo's time. Absolutely, and that he was able to cover topics and redirect that he didn't specifically mine in his direct examination. I'd like to also make the point that the district court can address the point made by counsel about the scope of witness impeachment. I think, as the court already noted, the best evidence, really, of the court's understanding of Rule 608B was what it actually did, and it did not prevent these defendants from questioning Mr. Menden and Mr. Harnowski about uncharged conduct. Just the opposite, Mr. Fields questioned Menden and Harnowski on at least 13 specific instances of conduct bearing on truthfulness, the vast majority of which related to uncharged conduct. I think Mr. Gorakoff made the point that what they were really trying to get at was that Mr. Fields was duped and that they were unable to elicit testimony about the fact that these partners duped Mr. Fields. Well, under cross-examination, Mr. Menden admitted that he directed an employee to forge Mr. Fields' name. That's at JA 2553. He admitted that he committed tax credit fraud. He admitted to defrauding investors. He admitted to forging documents. That's at JA 2544. And most importantly, defense counsel elicited information about Mr. Menden's guilty plea. He pled guilty to defrauding this bank, to committing bank fraud. And so what better evidence than that that Mr. Menden and Mr. Harnowski had a pattern of deceiving this bank? They got that. The only question really is, should they have been permitted to delve into further gratuitous detail? And I think the court rightly concluded that they should not. I see that my time has expired. And so, again, we ask the court to affirm these convictions and sentences.  Thank you, Your Honor. I'd like to take up on the question of direct testimony, and I'd like to correct something in response to Judge Motz's earlier question. When I said seven and a half hours, I meant on his direct testimony, not the entirety of the testimony. And also, I believe his case was four days after the government, including the government's cross-examination, his redirect. To Judge Shedd's question, the district court specifically admonished counsel that the scope of redirect would be narrow. And we cite, I believe, three instances in our brief where that admonition is made. And, in fact, he cut off some testimony based on that, that the scope of redirect is narrow. I'd like to stress- It was narrow. Did he let you ask about anything that the government had asked about on cross? Yes. He allowed him to testify about things the government asked about on cross. Well, those things aren't inconsistent then. The government said he let you ask anything you wanted to on what they'd asked, but that is still not unlimited, I guess. Right. He couldn't address all of the transactions, which one point I'd like to stress to this court is there was a very extensive speaking indictment in this case that the judge originally said would not go back with the jury, but that, in fact, did go back with the jury. And the structure of Mr. Fields' testimony was structured around answering the allegations of that indictment in the order in which they were presented in the indictment. So he did not reach those things. And by the government's logic that he was allowed to answer on redirect, I mean, by that logic, it would be permissible to allow the government first to cross the defendant and then the defendant to address everything on redirect. And I don't believe that's the case. And with many of the transactions in this case, that's what the defendant was left to do. He was just left to answer within the narrow scope of which the government asked the questions. He wasn't allowed to tell the complete story. Have you ever tried a case when you got all the time you wanted? Your Honor, I've never had a case where I got all the time I wanted. However, I've never had a defendant cut off in his testimony. And I would also respectfully submit that the lead trial counsel in this case had over 35 years experience, and he had never had a defendant cut off in the testimony. And I think what's telling about this is that when the trial counsel tried to make a proffer regarding where he wanted to go with the defendant's testimony, the district court did not allow him to make that proffer. And when trial counsel tried to object to the time limits in accordance with this court's precedent in Titus and the Midget case, he tried to make an objection, just simply make an objection to the time limitations. How long do you say your proffer would have taken? I believe the proffer could have been covered in a couple sentences, Your Honor, because all it would have required telling the court that he needed to address the remaining Menden and Hronowski transactions, which were in the speaking indictment. And so, Your Honor, Is it an accurate characterization that the first hour or so of the examination of him didn't cover any of these transactions? Your Honor, I think that's accurate. I believe that that testimony was essential for the jury to understand the context of the transactions, because they talked about such things as the lending practices at issue, which were important to understand the transactions. Thank you, Your Honor. Thank you. May it please the Court, again, on behalf of Ed Woodard, several points. First of all, each of these counts that we challenged the sufficiency had as an element either an intent to defraud or an intent to injure or damage the bank. And the uncontradicted evidence in this case is that Mr. Woodard gave up voluntarily $2 million in benefits that he was entitled to, that he had earned as President, CEO, Chairman of the Board. We have urged in our brief that that rises to the level really as a matter of law in rebutting and refuting any intent to defraud or injure. It is absolutely inherently incredible to believe that he would harbor an intent to defraud, damage, injure the bank, when, in fact, he voluntarily surrendered $2 million in benefits. That sounds like a good jury argument. That's not as a matter of law. Well, I think it's so unusual, Your Honor, in a case of this type that I think it's worthy of comment. And I understand and respect your view. We made that argument as well to the jury. In addition, I just want to briefly – I've got five seconds. I don't know if I can say anything else. My time is up. All right. It's a pleasure in any event. Good to see all of you. We've got a lot of submissions from you all. Yes, you have. Thank you, Your Honor. Appreciate it. I don't know that I have anything direct to say in rebuttal to what was brought up by the government. I think one thing that was in their brief indicating the evidence that supports the conspiracy count, they talk about some properties, bank properties, that Brandon Woodard had an interest in. What they failed to show was that three of the four properties, he merely stepped in the shoes of someone who was on the board of directors who previously owned these bank properties and transferred them to Brandon. So I don't understand why Brandon's interest in real estate, it becomes criminal, whereas the predecessor who was on the board of directors is not criticized in any means for this. I think the government also relies on the fact that there was a cost of remodeling that bank, Suffolk Bank was included, cost for remodeling his condo, and that was a jury count that he was found not guilty of. So I think the government has put forth very little evidence to support count one of the indictment, the conspiracy. Thank you. Thank you very much. We will come down and greet the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, Dennis W. Shedd, Albert Diaz